## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TEWOBESTA FESSEHA TESFAYE, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ANTONY J. BLINKEN, *et al.*,<br><br>        Defendants. | Civil Action No. 22-411 (CKK) |

## MEMORANDUM OPINION
(September 29, 2022)

Pending before the Court is a [33] Motion for a Temporary Restraining Order filed by Plaintiffs Assefa Alem Tegegn, Sintayehu Arega, Elsabet Tilahun Demelash, B.N.A., B.T.A, S.A.A, and A.A. ("Plaintiffs"[1]) on September 27, 2022.  Plaintiffs are Ethiopian nationals and selectees of the FY-2022 Diversity Visa Lottery and their beneficiaries.  By statute, their eligibility to receive diversity visas expires tomorrow, September 30, 2022. Plaintiffs seek an order compelling Defendants to schedule their interviews before the September 30 deadline and issue diversity visas to them and/or to preserve unused visas during the pendency of this litigation.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court **DENIES** Plaintiffs' [33] Motion for a Temporary Restraining Order.

---

[1] Unless otherwise specified, "Plaintiffs" refers to the Plaintiffs who have filed the pending Motion for a TRO, not the entire group of plaintiffs in this case.

[2] The Court's consideration has focused on Plaintiffs' Motion for a Temporary Restraining Order ("Pls.' TRO Mot."), ECF No. 33; and Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Defs.' TRO Opp'n"), ECF No. 35.  The Court has also considered the pleadings related to Defendants' Motion to Dismiss to the extent they address the claims at issue in Plaintiffs' TRO Motion:  Defendants' Motion to Dismiss ("Defs.' Mot. to Dismiss"), ECF No. 11; Plaintiffs' Opposition to Defendants' Motion to Dismiss, ECF No. 14 ("Pls.' Opp'n"), ECF No. 14; and Defendants' Reply in Support of their Motion to Dismiss ("Defs.' Reply"), ECF No. 15.  In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

# I.   BACKGROUND

## A.  The Diversity Visa Program

Under the Immigration and Nationality Act ("INA"), "Congress has provided for up to 55,000 immigrant diversity visas to be distributed each fiscal year to foreign nationals that hail from countries with historically low levels of immigration to the United States."[3] *Filazapovich v. Dep't of State*, No. 21-cv-943 (APM), 2021 WL 4127726, at *2 (D.D.C. Sept. 9, 2021) (citing 8 U.S.C. §§ 1151(e), 1153(c)).  "Millions of hopefuls enter a lottery for the chance to apply for one of the 55,000 allotted diversity visas."  *Id.*  (citing *Gomez v. Trump* ("*Gomez I*"), 485 F. Supp. 3d 145, 159 (D.D.C. 2020)).  The selectees of the lottery "submit an application and various documents to be eligible for a visa number," which can be used only during the fiscal year for which the selectee applied.  *Almaqrami v. Pompeo*, 933 F.3d 774, 776–77 (D.C. Cir. 2019).

Demand for diversity visas "regularly outstrips supply."  *Gomez I*, 485 F. Supp. 3d at 159; *see also P.K. v. Tillerson*, 302 F. Supp. 3d 1, 3 (D.D.C. 2017) ("Millions of people enter the lottery every year.").  Moreover, the "total number of lottery selectees exceeds the statutory numerical limit of visas" allocated to the DV program because if the Department "did not over select DV participants, it would not be able to use the full allocation of DV numbers."  [First] Declaration of Morgan Miles ("1st Miles Decl.") ¶ 5, ECF No. 11-2.  "Those selected for the [diversity visa] program are not guaranteed a visa—only the opportunity to apply for one."  *P.K.*, 302 F. Supp. 3d at 3.  According to Defendants, 63,753 people were selected from the Fiscal Year 2022 Diversity Visa ("DV-2022") lottery, accounting for 118,513 diversity visa applicants (including selectees'

---

[3] *See Babamuradova. v. Blinken*, Civ. Action Nos. 22-1460, 22-1990, 22-2428 (JDB), 2022 WL 4479801, at *1 (D.D.C. Sept. 27, 2022) ("A number of those are reserved for use under a separate program (established by the Nicaraguan and Central American Relief Act), so the State Department estimates that only 54,850 diversity visas will actually be available this year.").

spouses and children) seeking one of approximately 55,000 available visas.  1st Miles Decl. ¶ 4.

As of September 25, 2022, the State Department has issued 50,500 immigrant visas to diversity

visa applicants for the FY-2022 program and USCIS has used 1,440 diversity visa numbers for

"adjustment of status."  [First] Declaration of Brenda Grewe ("1st Grewe Decl.") ¶ 2, ECF No.

35-1.

The Kentucky Consular Center ("KCC") selects lottery applicants using a random number

system which generates "rank order number[s]" broken down into six geographic regions."  *See*

9 FAM § 502.6-4(c)(2)(a)–(b). "Within each region, the first entry randomly selected will have a

rank order number 00000001, the second entry selected will be 00000002, etc." *Id.* §

502.6-4(c)(2)(b).

To apply for a diversity visa, lottery selectees are required to submit a form DS-260.

9 FAM § 502.6-4(d)(1)(a).  Once applicants submit a completed DS-260, then "[o]rdinarily . . .

the case will be 'documentarily qualified' for purposes of visa appointment scheduling."  *Id.*

§ 502.6-4(d)(1)(b).  Prior to December 2021, applicants were required to submit supporting

documentation with their DS-260.  *See id*.  However, updated guidance issued by the State

Department in December 2021 revised that requirement, directing: "DV-2022 selectees no longer

must submit to the KCC any other required supporting documents for DV-2022 in order to be

eligible to be scheduled for an in-person interview at an embassy or consulate."  Pls.' TRO Mot.

Ex. A, Diversity Visa 2022 Update ("Dec. 9, 2021 Guidance"), ECF No. 33-3.  Rather, "selectees

will submit all required supporting documents to the designated interviewing post, which will

evaluate the documents."  *Id.*  "Under either documentation policy, the fact than an applicant is

'documentarily qualified' does not alone make him or her eligible to schedule an interview: the

applicant's regional lottery rank number must also be 'within the applicable rank cut-off for that month.'" *Babamuradova*, 2022 WL 4479801, at *1 (citing 9 FAM § 502.6-4(c)(2)(c)).

"Under a prior version of the FAM guidelines, KCC would 'schedule an appointment for a 'documentarily qualified' applicant when their regional lottery rank number is a*bout to become current.*" *Id.* (citing Archived Version of 9 FAM § 502.6, Pls.' TRO Mot. Ex. C, ECF No. 33-5) (emphasis added).   However, under the current version of these guidelines, implemented in mid-February 2022, KCC will "schedule an appointment for applicants that have completed processing at KCC *around the time* their regional program rank number *is current*."  9 FAM § 502.6-4(d)(2) (emphasis added); *see* Pls.' TRO Mot. Ex. B, ECF No. 33-4.

When the applicant's documents have been submitted and the KCC has completed processing them, the case is "reported to the Visa Office," which "allocates a visa number," making the case eligible to be scheduled for an interview.  *Babamuradova*, 2022 WL 4479801, at *2.  As a practical matter, "the schedule for interviews is "not solely dependent on the regional rank order assigned to an applicant.  Within each region, there are a number of posts, each with their own schedule and capacity.  An applicant with a lower regional rank number could nonetheless be scheduled for an interview after a higher-numbered applicant if, say, the processing of their documents was completed later (either due to the applicant's delay or issues with the documents submitted) or if the post to which they are assigned has more applicants or schedules interviews more slowly than a different post (even one within the same region)."  *Id.* at *5.  Moreover, "the availability of interview appointments" depends on "the available resources and competing demands of consulates in an applicant's country of residence."  *Gjoci v. Dep't of State*, Case No. 21-cv-294-RCL, 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021).

All immigrant visa applications must be reviewed and adjudicated by a consular officer. 8 U.S.C. § 1202(b).  Unless "otherwise directed," a non-citizen applying for an immigrant visa "shall make [an] application at the consular office having jurisdiction over [the applicant's] place of residence." 22 C.F.R. 42.61(a).  However, "a consular office may, as a matter of discretion, or shall, at the direction of the Department, accept an immigrant visa application from an alien who is neither a resident of, nor physically present in, the area designated for that office for such purpose." *Id.*  Although posts are "encouraged" to accept cases of non-residents "clearly involving hardship," they are not required to do so.  9 FAM § 504.4-8(D)(1)(b).  The State Department has also set out specific procedures for "homeless visa applicants," those who are "national[s] of a country in which the United States has no consular representation or in which the political or security situation is tenuous or uncertain enough that the limited consular staff is not authorized to process IV applications."  9 FAM § 504.4-8(E)(1)(a).  The National Visa Center assigns "homeless" visa applicants to other posts for processing.  *Id.*  The Visa Office designates and publishes a list of the countries whose nationals are considered "homeless" for purposes of visa adjudications.  *Id.*

"Consulate offices (referred to as "posts") are responsible for processing a wide range of immigrant and nonimmigrant visas." *Babamuradova*, 2022 WL 4479801, at *3.  In November 2021, the State Department issued Cable "21 STATE 115378," which rescinded earlier "mandatory prioritization guidance" put in place during the COVID-19 pandemic and directed "[c]onsular chiefs [to] determine the priority order of consular services processed at post." *Id.*; *see* Pls.' TRO Mot. Ex. F, Recalibration Cable at 1, ECF No. 33-8.  Pursuant to this so-called "Recalibration" policy, consulates in FY-2022 "had greater flexibility in prioritizing visa

applications than they previously had during much of the pandemic." *Babamuradova*, 2022 WL 4479801, at *3.

"Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the [fiscal year]." *Almaqrami*, 933 F.3d at 777. As a result, "[i]f the selectee does not receive a visa by the end of the fiscal year . . he is out of luck[.]" *Gomez I*, 485 F. Supp. 3d at 159.

## B.  Facts Specific to Visa Processing at the U.S. Embassy in Addis Ababa, Ethiopia

On November 2, 2021, the Ethiopian government instituted a nationwide "State of Emergency." Declaration of Nathan Webber ("Webber Decl." ¶ 7), ECF No. 35-3. On November 5, 2021, the State Department ordered "all non-emergency U.S. government employees and their family members to depart Ethiopia due to armed conflict, civil unrest, and possible supply shortages." *Id.* The "deteriorating security environment necessitated Ordered Departure of embassy personnel and reduced consular section staffing by nearly 40 percent." *Id.* In preparation for potential evacuation of the post, the Department also directed the U.S. Embassy in Addis Ababa to ship all Immigrant Visa files to the United States; these files were returned to the post in June 2022. *Id.*

Nathan Webber, the Visa Chief in the Consular Section at the U.S. Embassy in Addis Ababa attests that this emergency situation caused most "consular resources" between November 2021 and February 2022 to be "redirected" to "support[ing] U.S. citizens seeking to urgently depart the country," to "assist U.S. citizens who were arbitrarily detained under the [State of Emergency]," and to "evacuat[e] more than 200 U.S. citizens, legal permanent residents and immigrant visa applicants from the war-torn Tigray region." *Id.* Accordingly, the Consular Section of that post "suspended most routine visa processing." *Id.*

On February 1, 2022, the "Ordered Departure" directive was terminated. *Id.* The Consular Section resumed "limited visa processing in February 2022" and "limited diversity visa processing in April 2022." *Id.* Declarations submitted by Mr. Webber and other State Department employees detail significant backlogs in *all* Immigrant Visa processing due to this civil and political unrest, as well as the COVID-10 pandemic. *See id.* ¶¶ 6, 7; Declaration of Rebecca Austin ("Austin Decl.") ¶ 3, ECF No. 35-5. Ethiopia was not designated as country "whose nationals are considered homeless" during this temporary suspension of immigrant visa processing. Pls.' TRO Mot. at 7–8.

As of September 21, 2022, the consular section of the U.S. Embassy in Ethiopia had scheduled interviews for "359 [FY-2022] DV cases, associated with 590 prospective applicants (selectees and their derivatives)." [Second] Declaration of Morgan Miles ("2d Miles Decl.") ¶ 4, ECF No. 35-4. As of the same date, there are 898 FY-2022 DV cases associated with 1,352 prospective applicants assigned to the U.S. Embassy in Addis Ababa that are eligible to be scheduled for interviews.

## C. Plaintiffs' Diversity Visa Applications

Plaintiffs Assefa Ale Tegegn and Sintayehu Arega are Ethiopian nationals and selectees in the FY-2022 diversity visa lottery. Compl. ¶¶ 36, 42, ECF No. 1. Plaintiffs Elsabet Tilahun Demelash, B.N.A., B.T.A, S.A.A, and A.A. are Plaintiff Tegegn's derivative beneficiaries. *Id.* ¶ 37.

Plaintiff Arega attests that his case (2022AF00039044) became "current" on April 1, 2022 and he was notified by the KCC on April 20, 2022 that it had finished processing his DS-260. Declaration of Sintayehu Mulugeta Arega ("Arega Decl.") ¶¶ 10–11, ECF No. 33-9. Plaintiff Arega claims that he contacted the KCC "to try to get assigned to another embassy" because

"Addis Ababa was not scheduling . . . DV interviews." *Id.* ¶ 19. Although he does not specify when he contacted KCC to request such a transfer, it appears that he did so prior to February 24, 2022—in other words, before his case was current. *See id.* ¶¶ 19–21.

Plaintiff Tegegn also attests that his case (2022AF00039393) became "current" on April 1, 2022. Declaration of Assefa Alem Tegegn ("Tegegn Decl.") ¶ 10, ECF No. 33-10. Plaintiff Tegegn indicates that he requested that KCC transfer his "interview location to another country" when the U.S. Embassy in Addis Ababa "was not offering visa interviews." *Id.* ¶ 12. There is no indication when he made such a request and whether he did so before or after his case became "current." He states that he "was not granted" a transfer. *Id.* ¶ 13.

As of the date of this Memorandum Opinion, Plaintiffs have not been scheduled for a consular interview. As noted above, there are 1,352 similar-situated diversity visa applicants assigned to the U.S. Embassy in Addis Ababa, comprising 898 DV cases that are eligible to be scheduled for consular interviews. 2d Miles Decl. ¶ 5. There are ***669 cases*** ahead of Plaintiff Arega in the scheduling queue and ***675 cases*** ahead of Plaintiff Tegegn and his beneficiaries. *Id.*

Plaintiffs filed their Motion for a TRO three days before the expiration of their eligibility for diversity visas. *See* Pls.' TRO Mot. In light of the fast-approaching end of the 2022 fiscal year, the Court, observing that Defendants had addressed many of the arguments raised by Plaintiffs in their pending [11] Motion to Dismiss, directed Defendants to file a response to Plaintiffs' TRO Motion by no later than 5:00pm on September 28, 2022, addressing only specific arguments. *See* Minute Order (Sept. 27, 2022). Defendants filed their response on September 28, 2022. The Court renders its decision on Plaintiffs' TRO Motion without requiring a reply brief from Plaintiffs due to the impending September 30, 2022 deadline and because the Court finds that a reply brief would not facilitate the Court's decision.

## II.   LEGAL STANDARD

A temporary restraining order "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).   An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)).   A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal quotation marks omitted)).   When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C.

Cir. 2009)) (internal quotation marks omitted).  "The four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291.  Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015).  Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)).  However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis.  *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.  In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

### III.   DISCUSSION

For the reasons set forth below, the Court concludes that Plaintiffs have not carried their burden of demonstrating a likelihood of success on the merits, a certainty of irreparable harm, or that the balance of the equities and the public interest tilt in his favor.  Accordingly, the Court **DENIES** Plaintiffs' [33] Motion for a Temporary Restraining Order.

### A.  Likelihood of Success on the Merits

First, in order to receive a TRO, the moving "party must show, among other things, 'a substantial likelihood of success on the merits.'"  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d

905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)).  The D.C. Circuit has identified a "likelihood of success on the merits" as the "most important factor" for courts to consider when contemplating a motion for preliminary injunctive relief.  *Aamer*, 742 F.3d at 1038.

"The merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (internal quotations and citations omitted).  Therefore, "[t]o establish likelihood of success on the merits, Plaintiffs must first establish that their claims are justiciable." *Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074, at *4 (D.D.C. Sept. 27, 2021) (citing *Food & Water Watch, Inc.*, 808 F.3d at 913).  A plaintiff who fails to show a substantial likelihood of jurisdiction is "not entitled to any relief, let alone the extraordinary remedy of a preliminary injunction."  *See Schindler Elevator Corp. v. WMATA*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020), *aff'd* No. 21-7008, 2021 WL 4928730 (D.C. Cir. Oct. 22, 2021).

### 1.  Plaintiffs Lack Standing to Challenge State Department Policies.

Plaintiffs have failed to establish a likelihood that they have standing to challenge the State Department policies that they contend have contributed to the alleged "delay" in scheduling their interviews.  The Court shall first address Plaintiffs' standing to challenge to the alleged "No Reassignment" policy, and then shall discuss additional policies cited in Plaintiffs' TRO Motion, including the "Recalibration" Policy, the December 9, 2021 Guidance, and the February 2022 change to 9 FAM § 502.6-4(d)(2).  Before doing so, the Court presents the legal framework applicable to its analysis.

"To establish standing, the plaintiff must show (1) it has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision[.]" *Elec. Privacy*, 878 F.3d at 376–77 (cleaned

up) (citation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (describing the three requirements for standing). "When plaintiffs sue based on a 'procedural injury'—or the agency's failure to act according to an applicable statutory or regulatory framework—that claim 'must be tethered to some concrete interest adversely affected by the procedural deprivation: A procedural right in vacuo . . . is insufficient to create Article III standing.'" *Gjoci*, 2021 WL 3912143, at *8 (cleaned up) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). A plaintiff may argue that the challenged actions have merely increased the risk of harm to the plaintiff, but if so, the plaintiff must show "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." *Food & Water Watch, Inc.*, 808 F.3d at 914 (citation omitted).

As to redressability in the context of procedural harms, plaintiffs need not show that "compelling the agency to follow the correct procedure would lead to a substantive result that favors [their] concrete interests," only that their "concrete interests could be better protected." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020).

Plaintiffs here contend that they have suffered a "procedural injury arising from Defendants' withholding and unreasonable delay in scheduling Plaintiffs" for consular interviews. Pls.' TRO Mot. at 14. To demonstrate standing based on this alleged procedural injury, they must establish that the failure to be interviewed before the September 30 deadline is "fairly traceable" to the challenged policies or that those policies "substantially increased" the "risk that plaintiffs will not receive an interview before September 30, 2022." *Babamuradova*, 2022 WL 4479801, at *5. As to redressability, Plaintiffs need not show that their concrete interest—receiving a diversity visa—will be achieved by a favorable court ruling, only that a favorable court ruling "could still change the substantive outcome*," Narragansett Indian Tribal Historic Pres. Off.*, 949 F.3d at 13,

namely, "by granting plaintiffs an interview which could lead to a visa," *Babamuradova*, 2022 WL 4479801, at *5.

a)   <u>"No Reassignment" Policy</u>

The Court first considers Plaintiffs' arguments pertaining to an alleged "No Reassignment" policy specific to Ethiopian DV lottery selectees. *See* Pls.' TRO Mot. at 6–8, 29–31. In summary terms, Plaintiffs allege that Defendants "refused" to transfer their cases to other posts for processing during the period that consular services were suspended at the U.S. Embassy in Addis Ababa. *Id.* at 8. Though not entirely clear from Plaintiffs' pleadings, it appears that Plaintiffs contend that the State Department implemented this alleged policy *both* by (1) failing to designate Ethiopia as a country whose nationals are considered "homeless" for visa processing purposes; and (2) by refusing Plaintiffs' individual requests for their cases to be transferred to other posts. *See id.* at 6–8. Plaintiffs fail to demonstrate that they have standing to pursue either theory.

*First*, Plaintiffs have cited no evidence demonstrating that any alleged "No Reassignment" *policy* even exists. Defs.' TRO Opp'n at 16. Defendants categorically deny that any such policy is in place. *See* Defs.' Mot. to Dismiss at 1. To demonstrate standing to challenge a policy, it is (unsurprisingly) necessary to demonstrate "the existence of the challenged policy." *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987). Although Plaintiffs offer testimony that they were unsuccessful in *their own* efforts to obtain a transfer, the Court finds such anecdotes insufficient to support that a universal policy exists.

*Second*, Plaintiffs have failed to demonstrate that any alleged "No Reassignment" policy substantially increased the likelihood that they would not obtain a consular interview, and therefore would be unable to receive a visa. Plaintiffs both attest that their cases did not become "current"

until April 1, 2022.  By April 2022, the U.S. Embassy in Ethiopia resumed processing diversity visa applications, albeit in a limited capacity.

And *third*, to the extent Plaintiffs contend that Defendants were obligated to classify Ethiopians as "homeless" so that their applications would have been transferred to another post, the record lacks any evidence showing that *had* Defendants done so, Plaintiffs would have been more likely to obtain an interview at a different consular post.  There is nothing on the record to indicate, for example, how many interviews any nearby posts had available and/or where Plaintiffs' regional rank number would have placed them in the interview queue.  Moreover, had the State Department transferred all Ethiopian applicants to another post (as Plaintiffs appear to suggest), Plaintiffs presumably would have *still* been behind at least 669 cases of Ethiopian selectees alone.  Accordingly, Plaintiffs have failed to demonstrate that the purported failure to declare them "homeless" and assign their visa applications to another post "substantially increased" the risk that they would not obtain an interview sufficient to confer standing.

b)  Other State Department Policies

In their TRO Motion, Plaintiffs also attribute their "procedural injury" to three other "policies" affecting DV-2022 applicants.  *First*, the "Recalibration" policy indicated that it is the is "the Department's policy to use as many of the 55,000 diversity visas available each fiscal year as possible" and "listed other types of visas that consulate offices may want to prioritize, including "immediate relative cases and nonimmigrant visa applications of fiancés of U.S. citizens." *Babamuradova*, 2022 WL 4479801, at *5 (citing Recalibration Cable at 3–4).  Plaintiffs claim that Defendants have "unlawfully prioritized" other types of visas under this policy, to the detriment of diversity visas.  Pls.' TRO Mot. at 11.  *Second*, the December 2021 Guidance changed the timing of when diversity visa applicants were required to submit documents in support of their DS-260;

instead of requiring them to submit such documents to the KCC with their DS-260, applicants instead were *only* required to submit the DS-260 to the KCC and would submit documents later (during their interviews).  And *third*, the February 2022 change to 9 FAM § 502.6-4(d)(2) altered the "timing of interviews vis-à-vis plaintiffs' rank numbers becoming current"—changing scheduling from when rank numbers were "about to become current" to "around the time the rank numbers are current."  *Babamuradova*, 2022 WL 4479801, at *5 (internal citations and quotation marks omitted).  Plaintiffs contend that these two latter policies together have made interview scheduling "inefficient."  Pls.' TRO Mot. at 10.

Consistent with other courts in this jurisdiction, the Court concludes that Plaintiffs have failed to demonstrate how *any* of these policies "altered the order of interviews or the number of interviews available."  *Babamuradova*, 2022 WL 4479801, at *5; *Khamrabaeva v. Blinken*, No. 22-CV-1219 (RC), 2022 WL 4446387, at *4 (D.D.C. Sept. 24, 2022) ("Plaintiffs fall short of showing a substantial increase in the risk of harm that is traceable to the challenged policies because diversity visa adjudications appear to have accelerated, not decreased, after the challenged policies took effect.").

At most, Plaintiffs point to examples of "30 applicants" with higher rank numbers than them whose cases have been scheduled for interviews.  *See* Pls.' TRO Mot. at 27–28 (citing Pls.' TRO Mot. Ex. N, ECF No. 33-16).   Plaintiffs offer no evidence or argument tying together the State Department policies and the scheduling of these thirty applicants.  Confronting a similar argument by plaintiffs claiming that lower-ranked applicants had "jumped" the queue, the court in *Babamuradova* explained: "The schedule for interviews is *not solely* dependent on the regional rank order assigned to an applicant. . . . An applicant with a lower regional rank number could nonetheless be scheduled for an interview after a higher-numbered applicant if, say, the processing

of their documents was completed later (either due to the applicant's delay or issues with the documents submitted) or if the post to which they are assigned has more applicants or schedules interviews more slowly than a different post (even one within the same region).  2022 WL 4479801, at *2.

But even assuming *arguendo* that these three State Department policies allowed thirty applicants to "skip" over Plaintiffs in the queue, Plaintiffs are still *hundreds* of spots away from being scheduled for an interview.  Had these thirty interviews been assigned purely by rank order, *none* of them would have gone to plaintiffs.   These numbers "underscore the challenge [plaintiffs] face in showing that any change in policy has significantly impacted their chance of receiving an interview before September 30."  *Babamuradova*, 2022 WL 4479801, at *6.  All plaintiffs are "simply too far back in line for a change in the challenged policies to have a substantial impact on their chances of receiving an interview."  *Id.*   In sum, Plaintiffs have not demonstrated an injury traceable to any of the challenged policies—and therefore have failed to carry their burden to demonstrate that they have standing to challenge them.

### 2. Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits that Defendants "Unlawfully Withheld" Interviews.

Plaintiffs also argue that Defendants are "unlawfully withholding Plaintiffs' interview[s] and by extension, their opportunity to apply for a Diversity Visa before the fiscal year deadline." Pls.' TRO Mot. at 18.

The APA authorizes courts to "compel agency action unlawfully withheld[.]"  5 U.S.C. § 706(1).  Section 706(1) "empowers a court to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (internal citations and quotation marks omitted). Similarly, mandamus relief cannot be used to "compel or control a duty in the discharge of which

by law [a federal officer] is given discretion" and is only appropriate where the defendant official owes the petitioner a clear and nondiscretionary duty. *Work v. United States ex rel. Rives*, 267 U.S. 175, 177–78 (1925); *see also Heckler v. Ringer,* 466 U.S. 602, 616 (1984).

Plaintiffs contend that 8 U.S.C. § 1202(b) imposes on the government a "non-discretionary" duty to adjudicate their diversity visa applications. Pls.' TRO Mot. at 20. Section 1202(b) provides: "All immigrant visa applications shall be reviewed and adjudicated by a consular officer." Plaintiffs cite no authority supporting their contention that Defendants have a non-discretionary, mandatory duty to complete its review of their particular visa applications by the fiscal year deadline. *See, e.g.*, *Dehghanighanatghestani v. Mesquita*, Civil Action No. 22-2595 (CKK), 2022 WL 4379061, at *5 (D.D.C. Sept. 22, 2022); *Pushkar v. Blinken*, Civ. Action No. 21-2297 (CKK), 2021 WL 4318116, at *10 (D.D.C. Sept. 23, 2021). Other courts have agreed that § 1202(b) imposes *no* duty on consular officers to adjudicate *all* FY2022 diversity visas, much less the application of any particular individual. *See, e.g. Babamuradova*, 2022 WL 4479801, at *9; *Tetteh v. Blinken*, Case No. 22-cv-02208 (APM), 2022 WL 4464999, at *3 (D.D.C. Sept. 26, 2022) ("The court has never said that the State Department has a duty to process and adjudicate any particular visa application."); *Bou Jabbour v. Blinken*, Case No. 22-cv-00451 (APM), 2022 WL 4482626, at *2 (D.D.C. Sept. 26, 2022) (same); *Nahardani v. Blinken*, Civil Action No. 1:22-cv-01926 (CJN), 2022 WL 4474054, at *1 (D.D.C. Sept. 26, 2022) ("Plaintiffs have not shown that the State Department has a statutory duty to adjudicate their visa application by September 30, 2022."); *Khamrabaeva*, 2022 WL 4446387, at *5–6; *Gomez I*, 485 F. Supp. 3d at 196 ("To be clear, there is no statutory requirement that every available diversity visa be issued each year."). Plaintiffs have failed to demonstrate that § 1202(b) imposes a non-discretionary duty on

Defendants to schedule *their* visa interviews or issue *their* diversity visas before the September 30, 2022 deadline.

Plaintiffs also point to portions of the FAM guidelines and the Department's Recalibration Policy as imposing a "non-discretionary" duty to schedule them for interviews. *See* Pls.' TRO Mot. at 18–20. Other courts have squarely rejected arguments that these procedures are sources of a mandatory, nondiscretionary duty to adjudicate any particular visa application. *See Nahardani*, 2022 WL 4474054, at *2; *Zakon v. Blinken*, Civil Action No. 1:22-cv-01524 (CJN), 2022 WL 4474053, at *2 (D.D.C. Sept. 26, 2022); *Nasab v. Blinken*, Civil Action No. 1:22-cv-02084 (CJN), 2022 WL 4473922, at *2 (D.D.C. Sept. 26, 2022). These guidelines "do not carry the force of law." *Babamuradova*, 2022 WL 4479801, at *9. They "do[ ] not require the State Department to take any action at all, let alone an action in a given time frame." *Id.*

In sum, Plaintiffs here have cited no authority supporting their contention that Defendants have a non-discretionary, mandatory duty to schedule interviews to complete adjudication of *their* particular visa applications by the fiscal year deadline. Accordingly, Plaintiffs have not carried their burden of demonstrating a substantial likelihood of success on the merits of their claims that Defendants have unlawfully withheld action on their diversity visa applications under the APA or Mandamus Act.

### 3. Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits that Defendants "Unlawfully Delayed" Scheduling Their Interviews.

The bulk of Plaintiffs' TRO Motion focuses on their claim that Defendants have unreasonably delayed processing their visa application. Pls.' TRO Mot. at 22–29. The APA requires that agencies "within a reasonable time . . . shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). If agencies fail to do so, courts may "compel agency action . . . unreasonably delayed." *Id.* § 706(1). To determine whether Plaintiffs are likely to succeed on

their claim that Defendants' adjudication of their diversity visa applications is "unreasonably delayed," the Court applies the six factors laid out by the D.C. Circuit in *Telecomms. Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80) (internal quotation marks omitted); *see also Skalka v. Kelly*, 246 F. Supp. 3d 147, 152 (D.D.C. 2017) (applying *TRAC* factors to claim for mandamus relief). Whether a delay is unreasonable "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).

a)   *TRAC* Factor 4

The D.C. Circuit has emphasized the "importance of competing priorities in assessing the reasonableness of an administrative delay." *Id.* at 1100 (internal quotation marks omitted). It

therefore has refused to grant relief—even where all other *TRAC* factors favored relief— where "a judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others back one space and produce[ ] no net gain." *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991); *see also Xiaobing Liu v. Blinken*, --- F. Supp. 3d ---, 2021 WL 2514692, at *7 (D.D.C. June 18, 2021) ("This factor not only favors Defendants, but ends up altogether dooming Plaintiffs' claims of unreasonable delay."); *Verma v. USCIS*, Civil Action No. 20-3419 (RDM), 2020 WL 7495286, at *9 (D.D.C. Dec. 18, 2020) ("To grant Plaintiff priority would push those individuals further back in line when the only difference between them is that plaintiff has brought a federal lawsuit." (internal quotation marks and citations omitted)).  Courts in this jurisdiction routinely decline to grant relief that would place one prospective visa applicant ahead of others. *See, e.g.*, *Xiaobing Liu*, 2021 WL 2514692, at *7; *Desai v. USCIS*, No. 20-cv-1005 (CKK), 2021 WL 1110737, at *7 (D.D.C. Mar. 22, 2021); *Verma*, 2020 WL 7495286, at *9.

Defendants contend that granting Plaintiffs the relief they seek in their TRO motion would merely "move their visa case to the front, displacing other noncitizens who are [a]waiting the scheduling of an appointment but who happen not to be litigants in this case."  Defs.' TRO Opp'n at 32.  In other words, granting Plaintiffs the relief they seek would merely "reorder a queue of applicants seeking adjudication."  *Tate v. Pompeo*, 513 F. Supp. 3d 132, 149 (D.D.C.  2021).  Based on similar circumstances, this Court has concluded that this *TRAC* factor weighs "heavily" in favor of Defendants. *Dehghanighanatghestani,* 2022 WL 4379061, at *7; *Pushkar*, 2021 WL 4318116, at *7.

Plaintiffs contend that "expediting" action on their visa petitions would have a "*de minimis*" effect on agency resources and priorities.  Pls.' TRO Mot. at 26.  They contend only that the State Department has "announced their dedication to issuing as many DV interviews as

possible" and that granting Plaintiffs the relief they request would comport with that policy. *Id.* These arguments fail to overcome what Plaintiffs are explicitly asking for in their motion: to compel Defendants to schedule their interviews before the hundreds of other diversity visa applicants ahead of them in the processing queue. The Court concludes that granting the TRO would simply allow Plaintiffs to skip the line, and the fourth *TRAC* factor strongly "suggests finding an unreasonable delay is inappropriate" in such circumstances. *Babamuradova*, 2022 WL 4479801, at *11; *see also Khamrabaeva*, 2022 WL 4446387, at *7 (noting that a TRO based on similar claims by diversity visa selectees would be "a judicial order moving them up, and therefore others back, with no net gain"). This factor weighs heavily in favor of Defendants and Plaintiffs are not likely to show success on the merits as to the fourth *TRAC* factor.

> b) *TRAC* Factors 1 and 2

The first and second *TRAC* factors require the Court to consider whether a "rule of reason" governs the time agencies take to make decisions and whether a "statutory timeline" supplies content for the "rule of reason" inquiry. *TRAC*, 750 F.2d at 80. Courts "typically consider [the first and second factors] together." *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 317–18 (D.D.C. 2020).

Plaintiffs have not demonstrated a substantial likelihood that the first *TRAC* factor weighs in their favor. "Whether the State Department has a 'rule of reason' 'cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" *Id.* (quoting *Mashpee*, 336 F.3d at 1102). Plaintiffs do not address these considerations, but merely

contend that the various State Department policies obligated Defendants to schedule Plaintiffs for an interview "by February 1, 2022."  Pls.' TRO Mot. at 23.  Defendants argue, on the other hand, that the adjudication of diversity visa applications in Ethiopia has proceeded according to a "rule of reason," accounting for emergency circumstances requiring the embassy to devote consular resources to (among other tasks) "assist[ing] U.S. citizens seeking to depart Ethiopia due to an internal armed conflict and civil unrest."  Defs.' TRO Opp'n at 28; *see also* Webber Decl. ¶¶ 5–7.  Based on the record before the Court at this early procedural juncture, Plaintiffs' applications did not become "current" until April 1, 2022—when the U.S. Embassy in Addis Ababa resumed processing diversity visas.  And based on competing demands of the consulate, the backlog of visa applications caused by an ongoing civil war, and Plaintiffs' order in the queue of visa applicants, Defendants did not reach Plaintiffs' applications in the queue of those eligible to be interviewed. Plaintiff has provided no contrary arguments or facts to suggest that Defendants' alleged "delay" in processing their visa applications is contrary to a rule a reason.

As to *TRAC* Factor 2, other courts in this jurisdiction have concluded that the INA "provides a clear indication of the speed with which it expects the agency to proceed in processing diversity lottery selectees' visa applications, which supplies content for the *TRAC* rule of reason." *Gomez I*, 485 F. Supp. 3d at 196 (internal quotation marks and citations omitted); *see also Filazapovich*, 2021 WL 4127726, at *18.  The court in *Gomez I* reasoned that § 1154 "sets an absolute, unyielding deadline by which selectees must receive their visas: 'Aliens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.'" 485 F. Supp. 3d at 196 (quoting 8 U.S.C. § 1154(a)(1)(I)(ii)(II)). The *Gomez I* court further pointed out that the *TRAC* factor 2 inquiry may be satisfied not only by "an express timetable," but instead

by "any other indication [ ] of speed." *Gomez I*, 485 F. Supp. 3d at 196 (citing *TRAC*, 750 F.2d at 80). It concluded, therefore, that "'[t]he specificity and relative brevity' of the September 30 deadline manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline." *Id.* (quoting *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012)).

Although the September 30 deadline to issue diversity visas suggests the "speed" at which Congress intended these visas to be processed, the INA does not impose any obligation on Defendants to process *all* diversity visas by the end of the fiscal year. *See* 8 U.S.C. § 1154(a)(1)(I)(ii)(II) ("[A]liens who qualify, through random selection, for a visa shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected."); *see Gomez I*, 485 F. Supp. 3d at 196 (observing that there is "no statutory requirement that every available diversity visa be issued each year").

In sum, Plaintiffs have not demonstrated that they are likely to succeed on the merits of their unreasonable delay claim as to the first *TRAC* factor. The second *TRAC* factor is a closer call; Congress has conveyed its intent that a certain number of diversity visa applications be processed by the end of the fiscal year. However, there is plainly no statutory obligation requiring *all* visa applications to be processed, much less Plaintiffs' particular petitions. The Court finds that, at most, the second *TRAC* factor is evenly balanced.

c)   *TRAC* Factors 3 and 5

The third and fifth factors are often considered together, and require the Court to consider the "nature and extent of interests prejudiced by delay" and whether "human health and welfare are at stake." *TRAC*, 750 F.3d at 80.

Plaintiffs may succeed on the merits of the fifth *TRAC* factor—that they will be prejudiced by the failure to obtain a visa by September 30. If Defendants fail to process their visas by September 30 (which, at this point is quite likely), they will lose the opportunity to immigrate to the United States through this fiscal year's diversity visa program. Plaintiffs offer myriad reasons why their failure to obtain a diversity visa will adversely affect their health and welfare—including that they have been negatively affected by the ongoing civil conflict, have lost out on job opportunities, and face "lack of security, freedom of expression, [and] clean water." Pls.' TRO Mot. at 24–25.

Although the Court is sympathetic to these concerns, it must also be mindful that "'many others' face similarly difficult circumstances as they await adjudication of their visa applications." *Mohammed v. Blinken*, 20-cv-3696 (TNM), 2021 WL 2866058, at *6 (D.D.C. July 8, 2021). As noted above, an order compelling Defendants to process Plaintiffs' visa applications would merely move their applications ahead of other visa petitioners to the front of the queue—to the detriment of other visa applicants who may be facing similar (or even more dire) circumstances.

Although Plaintiffs have demonstrated that they may be prejudiced by Defendants' failure to complete the processing of their visa applications by the September 30 deadline, the Court is not persuaded that they have demonstrated that they are likely to succeed on the merits with respect to the consideration of "human health and welfare"—because it is not just these Plaintiffs' "health and welfare" that the Court can consider, but also that of others similarly-situated.

a) <u>*TRAC* Factor 6</u>

The sixth *TRAC* factor notes that the "Court need not find any impropriety lurking behind agency lassitude in order to hold the agency action is unreasonably delayed." *Ghadami*, 2020 WL 1308376, at *9. Plaintiffs argue that Defendants' various policies, described *supra* Section I(A)(1),

demonstrate "bad faith."   The Court finds no evidence on the record in support of this assertion of "bad faith."   Accordingly, the Court "does not make any finding of impropriety on the State Department's part."  *Babamuradova*, 2022 WL 4479801, at *12.

***

In sum, Plaintiffs have not demonstrated a likelihood of success on the merits of their unreasonable delay claim.   Although Plaintiffs may succeed in showing that Congress has indicated the "speed" by which it intended a specified number of diversity visas to be processed and that they will be prejudiced if they fail to receive visas by September 30, 2022, they have failed to carry their burden of demonstrating a substantial likelihood of success as to the remaining *TRAC* factors.   Most notably, the TRO they seek would interfere with Defendants' allocation of resources and ability to assess competing priorities (including the processing of thousands of visa applications) by moving their  applications to the front of the line, to the detriment of others. Plaintiffs have not demonstrated a likelihood of success that the *TRAC* factors favor them, warranting relief under the APA or the Mandamus Act.

## B.  Irreparable Harm

The Court next considers whether Plaintiffs have demonstrated "irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted).  And "[p]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (internal citations omitted).   "[P]ossibility of irreparable harm" is not

enough.  *Id.*  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'"  *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (internal citation omitted).

Here, Plaintiffs argue that if they are not scheduled for consular interviews by September 30, 2022, they will lose their opportunity to obtain diversity visas in this year's cycle.  *See* Pls.' TRO Mot. at 35.  However, compelling Defendants to schedule their interviews would not necessarily address the "irreparable harm" Plaintiffs claim; their visa applications would still need to be approved or denied.  *See Almaqrami*, 933 F.3d at 777 ("*[I]f he meets the criteria to obtain one,* the State Department shall issue him a diversity visa.").  Plaintiffs' TRO Motion relies on the flawed premise that, by being selected in the diversity visa lottery and submitting the required documents, they are guaranteed a visa by the fiscal year deadline.  Not so.  They were instead given the opportunity to *apply* for one of approximately 55,000 available visas—as were the other 63,752 selectees (and their beneficiaries).  "Because an injunction will not redress [their] alleged injuries, [plaintiffs'] claim that [they] will suffer irreparable harm in the absence of a preliminary injunction is tenuous at best."  *Sierra Club v. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) (quoting *Navistar, Inc. v. EPA*, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011)).  Accordingly, the Court finds that Plaintiffs have not carried their burden of establishing certain irreparable harm, absent the specific injunctive relief they seek from this Court.

## C.  Balance of Harms and Public Interest

"The final two factors the Court must consider when deciding whether to grant a [temporary restraining order] are the balance of harms and the public interest."  *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013).  Where, as here, the government

is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club*, 990 F. Supp. 2d at 41. Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

As to these final two factors, Plaintiffs address the "public interest" underlying the diversity visa program at large.  Pls.' TRO Mot. at 38.  They also contend that the relief they seek "comport[s]" with the State Department's policy to adjudicate as many diversity visas as possible. *Id.*  These arguments are not sufficient to tilt these TRO factors in Plaintiffs' favor.  Plaintiffs have not demonstrated that there is any "public interest" in expediting processing of *their* visa application, as opposed to any other diversity visa applications or any other immigrant visa applications.  Although the Court recognizes that Plaintiffs may lose their opportunity to immigrate to the United States based on their selection in the FY-2022 diversity visa lottery if the processing of their diversity visas is not completed, the Court is not persuaded that this tips the balance of harms and the public interest in Plaintiffs' favor.  Granting Plaintiffs' requested relief would require Defendants to re-order their interview queue, potentially allowing Plaintiffs to move ahead of other similar-situated visa applicants—who, in turn, may lose their opportunity to obtain a visa. The Court reiterates that the number of applicants eligible for a diversity visa for the 2022 fiscal far exceeds the number of available visas.  As previously noted, being selected in the diversity visa lottery *does* not guarantee applicants the right to obtain a visa.

Overall, the Court finds that Plaintiffs have not demonstrated that the balance of the harms and the public interest weigh in favor of their requested TRO.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court concludes that Plaintiffs have failed to satisfy their burden of demonstrating a likelihood of success on the merits, a certainty of irreparable harm, or that the balance of hardships and the public interest weigh in their favor. Accordingly, the Court **DENIES** Plaintiffs' [33] Motion for a Temporary Restraining Order.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

**Date:** September 29, 2022